IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 19, 2020

**STATE OF TENNESSEE v. MORRIS L. LONG, II**

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2013-CR-47     Larry J. Wallace, Judge**

_____

**No. M2019-01085-CCA-R3-CD**

_____

Defendant-Appellant, Morris Long, was convicted by a Dickson County jury of first-degree premeditated murder, Tenn. Code Ann. § 39-13-202, and sentenced to life imprisonment. The sole issue presented for our review is whether the evidence was sufficient to support his conviction. Upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3, Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

William B. Lockert, III, District Public Defender, and Joshua C. Turnbow, Assistant Public Defender, for the Defendant-Appellant, Morris L. Long, II.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Ray Crouch, District Attorney General; and Jennifer Stribling, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On December 20, 2012, the Defendant bludgeoned his wife, Ashlee Long, the victim in this case, to death with a hammer. Her lifeless body was found by her parents a few days later at their home in Burns, Tennessee. The Defendant was subsequently indicted by the Dickson County Grand Jury for first-degree premeditated murder. The Defendant conceded at trial that he had killed the victim; however, he argued, as he does in this appeal, that the killing was "a crime of passion."

The State presented proof at trial concerning the events leading up to the day the victim was killed. Abigail Needham, the victim's mother, testified that the victim and the Defendant struggled financially and that she and her husband, the victim's stepfather, often gave them money to help cover their expenses. She explained that she had been giving the victim money to make her car payments, but the victim was giving the money to the Defendant, who was not making the payments. The day before the offense, the victim's car had been repossessed. The victim worked at Dairy Queen and was the sole financial provider for the family. On the morning of the offense, the victim asked her mother for a ride to work, and the victim's mother observed that the victim had been crying and was upset. The victim was dropped off at work between 11:15 and 11:25 that morning. Rochelle Robbers, a co-worker of the victim, also observed that the victim was depressed that day and overheard her tell another co-worker "today's not going to be a good day." Crystal Payne, another co-worker, stated that after she and the victim closed the restaurant that day, the victim told her that the Defendant was picking her up but was running late. Although the victim had discussed joining her mother at her younger brother's Christmas play that same night, the victim did not attend the play.

The next morning, December 21, 2012, the victim's mother and stepfather saw the Defendant near his father's truck parked beside their duplex as they left the home, but they did not speak with the Defendant. Pat Martin, the victim's father, testified that at 11:00 that morning, he went to visit the victim at work. The victim's co-workers told him she had not come in for her shift and suggested she may be running late. The victim's stepfather explained that it was unusual for the victim to go so long without contacting him or her mother because the victim and her children would visit their side of the duplex on a regular basis. The victim's mother grew concerned when she learned the victim had not shown up for work. Later that night, the victim's mother and stepfather went to check on the victim and proceeded to enter the home through the unlocked front door. Once inside, they did not observe any signs of a struggle. They attempted to open the victim's bedroom door but it was locked, which was unusual. They called the victim's father, a police officer, and asked him if they should pick the lock. The victim's father advised them not to enter the bedroom, and they returned to their side of the duplex.

The victim's mother and stepfather continued their search by going to the victim's workplace and making an inquiry about the victim. The victim's manager said she had not seen the victim since the Defendant picked her up from work the night before, so they headed home. Shortly after they got home, the Defendant approached them in the breezeway between the two sides of the duplex. The Defendant asked why they were looking for him, and the victim's mother clarified that they were looking for the victim. The Defendant told them that the victim was in Nashville shopping with a friend. He proceeded to ask the victim's stepfather for gas money, but this request was denied. The victim's stepfather asked the Defendant where the victim was and the Defendant said

"telling you where she is would defeat the purpose. . . ." After this encounter, the Defendant left the premises.

On the morning of December 22, 2012, the victim's mother and stepfather decided to open the victim's bedroom door. The victim's stepfather began to make out the silhouette of the victim's legs under the bed covers and told the victim's mother to leave the room and call 9-1-1. The victim's mother began frantically screaming at the 9-1-1 operator, so the victim's stepfather took out his cell phone and dialed a second call to 9-1-1. He told the operator he needed police to come to their location because he believed his stepdaughter was dead. The 9-1-1 operator asked if he could feel the victim's pulse. The victim's stepfather attempted to touch her neck, but covers were stuck to her. He placed his hand on the victim's side and notified the 9-1-1 operator that she was cold, stiff, and not breathing.

Penny Sanders, a friend of the Defendant, interacted with the Defendant on the evening of December 20, 2012, two days before the victim was found. Sanders testified that she was at the house of another witness, Stacy Butler, babysitting when the Defendant knocked on the door around 10:30 to 11:00 that evening. The Defendant asked Sanders if he could use her phone and told her he had run out of gas. After using Sanders' phone, the Defendant asked if he could use her car. Sanders said no but agreed to take him to get gas. After they got to the gas station, the Defendant went inside but quickly returned, stated that he did not have money, and asked Sanders for money. Sanders told the Defendant she only had a couple of dollars and the Defendant told her "that's not enough." Upon the Defendant's request, Sanders then drove him to the victim's father's house. The victim's father testified that he gave the Defendant a few dollars for gas and told him he needed to go be home with his wife and children. The Defendant returned to the car with the money and Sanders returned to the gas station where the Defendant purchased gas.

Sanders described the Defendant's demeanor as "dazed off and not really in tune with the conversation" she was attempting to have with him. She stated he looked tired, zoned out, and not himself. When the Defendant was putting the gas into his father's truck, gas was seeping out and spilling. Sanders testified that the Defendant attempted to light a cigarette over the spilled gasoline until she told him not to. She stated that while asking the Defendant about his children and family, the Defendant spontaneously stated that his father was going to be "so mad" at him. He repeated this statement multiple times during their interaction. The Defendant never told Sanders why his father would be mad at him.

A few minutes after 11:00 on the morning of December 21, 2012, the victim's father interacted with the Defendant again. After discovering the victim never came in for her shift at work, the victim's father drove to her house to see if she needed a ride to work. He testified that when he was nearing the duplex, the Defendant stepped out from some nearby

apartments and stopped him. The Defendant asked him if he had seen the victim, and he told the Defendant he had not. The Defendant proceeded to tell him that the victim was with her cousin. After this, the victim's father turned the car around and drove away. Later that day, he called the Defendant to see if he had heard from the victim. The Defendant told him the victim was out shopping with a different friend.

The Defendant's sister, Christina Orridge, traveled from her home in Nashville to visit family in Dickson on December 21. Orridge testified that the Defendant called her, not knowing she was in Dickson, and told her he needed to come to her house in Nashville to "get away" because he was "in trouble." She told the Defendant she would visit him as soon as she could and said he needed to go to the police if he had done something wrong. She picked the Defendant up at the home of Brandon Torres, a friend of the Defendant who lived near the duplex, around 3:00 in the afternoon. After the Defendant got into his sister's car, he told her to "get the eff away from the house." When she asked what was wrong, the Defendant told her that he had gotten into an argument with another man. He told her that the man "kept poking at him" so he "picked up a hammer and smashed him in the face."

The Defendant asked his sister if he could come with her to Nashville and she told him to stop talking because her children were in the car. The Defendant told her their brother had sent him money and that he wanted to go stay with him in North Carolina. The Defendant then asked her to take him to the bus stop in Nashville. She reiterated that the Defendant needed to go to the police and that he could not come with her. When his sister asked where the victim was, the Defendant said she was Christmas shopping with her mother. The Defendant's sister did not take him to the bus stop.

Brandon Torres testified that the Defendant returned to his home an hour or two after leaving with his sister. Upon the Defendant's request, Torres got a ride from his neighbor to retrieve gas for the Defendant. He took a small amount of money the Defendant gave him and purchased gas. After putting the gas in his father's truck, the Defendant asked Torres to come with him to cash a MoneyGram his brother had sent to him. He went with the Defendant to Walmart to cash the MoneyGram. An agent with the Tennessee Bureau of Investigation (TBI) identified video surveillance of the Defendant and Torres in the Walmart and testified that the Defendant "appeared to be nervous," and was "looking over his shoulder. . . like he was looking out for something." Torres and the Defendant went to a gas station where the Defendant purchased more gas, and the Defendant dropped him off at his apartment.

Torres described the Defendant's demeanor as stressed out and anxious. The Defendant told him "he may have hurt someone." Torres questioned this and the Defendant stated that he could not talk about it, but he would "eventually find out." On cross-

examination, he stated the Defendant appeared bothered, irritated, and paranoid, like he wanted to "undo whatever it was or talk to somebody but he wouldn't."

Stacey Butler, the ex-girlfriend of the Defendant's first cousin, was approached by the Defendant at her home around 10:00 on the evening of December 21. Butler stated she was pulling out of her driveway when the Defendant pulled up behind her. The Defendant asked her if she had any money for gas. She told the Defendant she also needed gas and that she would follow him to the gas station and fill both their tanks. She testified that she asked the Defendant how the victim was doing and that the Defendant told her she was "doing okay and she was at work." She described the Defendant's demeanor as "nervous, kind of jittery, skittish" and said he did not "act like his normal self."

Penny Trotter, a family friend of the Defendant, testified that the Defendant came to her house at 1:00 in the morning on December 22 while she had several friends over. The Defendant told her he needed a ride home because he did not want his father's truck to be seen there. No one at Trotter's home would give the Defendant a ride. She testified that the Defendant left her home and returned about an hour later wearing different clothes. The Defendant asked if he could sleep on her couch for the night and said his wife was out of town. The Defendant showed her a broken key and she agreed to let him sleep on her couch. She described the Defendant's demeanor as normal and said "[h]e certainly wasn't acting like he had killed anybody." On cross-examination, Trotter testified that her son told her he saw the Defendant looking into a mirror and shaking his head. At 8:00 that morning, she saw the Defendant driving away in his father's truck.

Covey Thompson, a semi-truck driver, was driving on Highway 70 South on the morning of December 22. As Thompson was approaching his exit, he saw the Defendant's father's truck on the side of the road and assumed it was broken down. He saw the Defendant at the front of the truck and thought he was repairing it. Once he got closer, he saw the Defendant in a running stance. The Defendant jumped in front of the truck and Thompson swerved to avoid him. When he saw the Defendant's shoes in the rearview mirror, he knew he had hit him. He immediately pulled over and called 9-1-1. By the time he made his way to the Defendant, several people were surrounding him and police were approaching.

Sergeant Daniel Cole, a police sergeant with the Metropolitan Nashville Police Department, was dispatched to the scene of the accident. The call coded the incident as a "safety hazard" and stated "there was an individual running in and out of traffic at I-40 East." When Sergeant Cole arrived at the scene, he observed "a pickup truck on the right shoulder of the interstate as well as a Pepsi 18-wheeler semi-truck" and "the Defendant lying in the right – far right lane of travel on I-40." He secured the scene while a passerby, who happened to be a vascular surgeon, rendered aid to the Defendant. Based on the

truck's tag, Sergeant Cole and other officers at the scene asked their dispatcher to contact Dickson County to locate the owner of the truck and notify them of the accident. He received a response telling him to call the Dickson County Sheriff's Department. The Dickson County sheriff's deputy told him about the crime scene in Dickson and TBI arrived to take over the accident scene.

TBI Agent Sean Adkins was assigned to investigate the crime scene at the duplex. When he arrived at the scene on the day the victim was found, it had been secured by the Dickson Police Department, and no evidence had been collected. He made an initial observation of the scene and then proceeded to take photographs. He stated that the home appeared normal and the crime scene was contained to the bedroom. A single drop of blood was on the floor a couple of feet away from the door and a massive amount of blood was on the wall above the head of the bed. He noted nothing in the room appeared to be disturbed and there was no sign of a struggle. The victim was lying on her stomach partially covered with comforters. The victim's left arm was underneath her with her head resting on her forearm, her left hand in a fist, and her right hand resting near her face.

Blood was pooled on the sheets by the victim's elbow and had dripped down the mattress, the box spring, and onto the floor. Blood was identified near the foot of the bed, on an ashtray and purse located to the right of the bed, and on the wall above the bedroom door. A piece of tissue from the victim's head was found on the instep of the victim's left foot. Agent Adkins described this tissue and the blood spatter near the foot and side of the bed as "cast-off." He testified that this blood traveled off of the murder weapon as it was flung back between blows. He stated that the larger amount of blood above the head of the bed was the result of impact spatter, blood that splashed out directly from the blows. The impact spatter was smeared. He described all the blood at the scene other than the pooling of blood on the victim, the clothing and pillow beneath her, the mattress, the box spring, and floor directly beneath the pooling to be either cast-off or impact spatter. The murder weapon, a hammer, was found at the scene. The victim's father identified the hammer as a tool that he kept in a toolbox stored in the breezeway between the two sides of the duplex. There was blood on both the head of the hammer and the shaft and hairs were attached to the hammer head.

After making these initial observations, Agent Adkins began removing the layers on top of the victim. The victim was wearing a bra, a shirt, and earrings and was not wearing underwear or pants. The pillow underneath the victim's head was soaked with blood. The cup of the victim's bra was also soaked with blood, indicating the victim was lying on the bra when killed. There was a large amount of blood on the victim's shirt. Two areas were void of blood, one above and one below the victim's shirt, indicating that something had been covering the areas when the blood was spattered. Agent Adkins testified that it appears the victim's shirt was pulled up while the blood was spattered and

was pulled back down after the victim was unconscious. The straps of the shirt were ripped, and the straps and clasp of the victim's bra were also ripped. A pile of cigarette ashes was found on the bed, between the victim's legs. Agent Adkins testified that the ashes had not been disturbed and were placed after all movement had stopped.

On cross-examination, Agent Adkins explained that no one from the serology unit of TBI was brought out to analyze the blood spatter because it was obvious that the blood originated from where the victim was lying. Although he admitted he is not a serology expert, he testified that he had completed a ten-week course in blood pattern analysis. Agent Adkins reiterated his previous testimony that the blood found at the foot of the bed was the result of cast-off and was not consistent with a struggle in which the victim was standing erect at the foot of the bed. He explained that if there had been a struggle at the foot of the bed, blood would be pooled on the floor and present on surfaces further away from the impact site. He testified that the pattern of blood across the victim's body indicated she was lying down when struck. He noted that if the victim had been standing erect when hit, blood would have dripped onto her shoulders, but instead there was a void of blood.

Agent Adkins testified that he only did a cursory search of the home for additional weapons because he deemed a detailed search unnecessary after the discovery of the hammer. He also noted that the cigarette butts in the ashtray to the right of the bed were not tested for DNA. He explained that ashes cannot be tested for DNA, so it would be impossible to connect a cigarette butt to the ashes found between the victim's legs. He stated that nothing indicated the victim was using or holding the hammer before the murder. On redirect, he emphasized that the placement of the tissue found on the instep of the victim's foot shows she was not moving during the attack.

Agent Charly Castelbuono, a Special Agent Forensic Scientist at TBI, performed forensic testing on the evidence collected in this case. The victim's fingernails and various areas of the hammer were tested for DNA. Only the victim's DNA was found on these items. She also performed forensic testing on the items of clothing the Defendant was wearing when he was hit by the truck on December 22. Two stains on a "doo-rag" head covering the Defendant was wearing tested positive for the victim's DNA. Only the Defendant's DNA was found on all the other items of clothing tested.

Agent Castelbuono performed an analysis on the slides created from the victim's vaginal swab. She testified that the examination confirmed the presence of the Defendant's semen and a small number of spermatozoa. She noted that only a small amount of the vaginal swab was applied to the slide to preserve the sample in case further testing was needed. She explained that this examination cannot determine when intercourse occurred or when sperm was deposited into the vagina as many factors can contribute to the amount

of sperm present in a sample, including the sperm count of the Defendant, the length of time that passes between the victim's death and the examination, and the decomposition of the body. On cross-examination, she confirmed that the prosecution did not request an analysis of the vaginal swab until three months after she received the evidence. She also testified that many of the items at the crime scene were not tested for DNA, explaining that the presence of the victim's blood on these items was so great that it would be extremely difficult to identify the DNA of anyone else.

Dr. David Zimmerman, a medical examiner for the State of Tennessee, performed the victim's autopsy on December 23, 2012. His main findings were "multiple lacerations and abrasions of the head, multiple fractures of the skull, injuries of the brain and associated bleeding." The cause of death was "multiple blunt force injuries to the head" and the manner of death was homicide. All the victim's injuries were confined to the right side of her head and face and no defensive wounds were found. Dr. Zimmerman identified lacerations underneath the victim's right eye that were made by significant force, enough force to tear the skin. He described the force used to make these lacerations as similar to "chopping wood." On the victim's skull, he identified at least fourteen separate impact sites. There were multiple fractures to the bones of the skull and the brain underneath these fractures was bruised and bleeding. Dr. Zimmerman stated that any one of these blows to the face or skull would be significant enough to render the victim unconscious or kill her. On cross-examination, he identified two lacerations close to the victim's nose that appeared to be the same size and shape as the claw from a hammer. He stated these injuries were caused by less force than the victim's other injuries.

The Defendant did not offer any proof. Following deliberations, the jury convicted the Defendant of first-degree premeditated murder. The Defendant was sentenced to life in prison. On May 29, 2019, the trial court conducted a hearing on the Defendant's motion for a new trial and amended motion for new trial, which were denied. The Defendant filed a timely notice of appeal, and his case is now properly before this court for our review.

## ANALYSIS

The Defendant contends that the State failed to prove he acted with the requisite premeditation in the murder of the victim. In response, the State argues that ample evidence was presented to support the jury's determination that the Defendant acted with premeditation. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)).

"Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

First degree murder is defined as "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 2011). Premeditation is defined as:

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (2019). The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Clayton, 535 829, 845 (Tenn. 2017) (citing State v. Dotson, 450 S.W.3d

1, 86 (Tenn. 2014); State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003)). Factors that may support the existence of premeditation include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, calmness immediately after the killing, and destruction and secretion of evidence of the killing. State v. Kiser, 284 S.W.3d 227, 268 (Tenn. 2009); State v. Leach, 148 S.W.3d 42, 53-54 (Tenn. 2004); Davidson, 121 S.W.3d at 615; Bland, 958 S.W.2d at 660. In addition, a jury may infer premeditation from any planning activity by the defendant before the killing, from evidence concerning the defendant's motive, and from proof regarding the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. Deb. 24, 1995) (citation omitted).

In challenging the sufficiency of the convicting evidence, the Defendant does not contest the fact that he killed the victim. Rather, he asserts the State failed to prove that he acted with premeditation beyond a reasonable doubt. The Defendant argues, as he did at trial, that he killed the victim during a heated argument. However, the victim was killed by multiple blows to the face and skull with a hammer, and the medical examiner counted fourteen separate impact sites on the victim's skull. Bland, 958 S.W.2d at 660; see also State v. Johnson, No. E2013-02346-CCA-R3-CD, 2015 WL 913657, at *11-12 (noting that while the infliction of "repeated blows. . . is not sufficient, by itself, to establish first degree murder," repeated blows along with proof of other factors indicating premeditation can establish evidence sufficient for a first-degree murder conviction) (quoting State v. Brown, 836 S.W.2d 530, 542 (Tenn. 1992)). There was also no evidence of a struggle, and the victim was unarmed with no defensive wounds. A TBI agent testified that the blood spatter at the crime scene indicated the victim was attacked while sleeping or lying down. The impact spatter above the head of the bed, the cast off on the victim's body, and the cast-off throughout the room also indicated that the victim could not have been standing erect when attacked. Based on the evidence, a rational trier of fact could have found, beyond a reasonable doubt, that the defendant acted with premeditation when he killed the victim with a hammer. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction of first-degree premeditated murder, and the Defendant is not entitled to relief.

## CONCLUSION

Upon our review, we affirm the judgment of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE